UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
HARVEY KATZENBERG,

                            Plaintiff,                           **MEMORANDUM and ORDER**

        — against —                                             05-CV-1146 (SLT)(SMG)

FIRST FORTIS LIFE INSURANCE
COMPANY,

                            Defendant.
--------------------------------------------------------x
**TOWNES, United States District Judge:**

        Plaintiff Harvey Katzenberg, a former president and CEO of Acme American Repairs,

Inc. ("Acme"), brings this action pursuant to Section 502 of the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1132, for an order directing defendant First Fortis Life

Insurance Company (now known as Union Security Life Insurance Company of New York) to

pay disability benefits which plaintiff alleges are due him under the terms of a group long-term

disability insurance policy covering Acme's employees.  Defendant now moves for "Judgment

on the Administrative Record and/or Summary Judgment," arguing that the arbitrary and

capricious standard of review applies to this case and that its decision to deny plaintiff disability

benefits was not arbitrary and capricious because it was reasonable and fully supported by

substantial evidence contained in the Administrative Record.  For the reasons set forth below,

this Court concludes that defendant's motion is best construed as a motion for summary

judgment, and that defendant is not entitled to summary judgment either on the issue of what

standard of review applies to this case or on the merits of plaintiff's claim.

Prior to his retirement, plaintiff was a longtime employee of Acme, a company which services commercial kitchen equipment. In 1993, during plaintiff's tenure with the company, Acme purchased a group long-term disability insurance policy ("the Policy") to cover its employees. The Policy provided, *inter alia*, that outpatients would receive only 24 months of benefits for disabilities caused by "mental or nervous disorders." Plaintiff's Rule 56.1 Statement of Material Facts ("Pl. Stat.") at ¶ 4; Defendant's Rule 56.1 Counter-Statement of Uncontested Material Facts ("Def. Stat.") at ¶ 4. The Policy also provided that it could "be changed at any time by an endorsement or amendment agreed upon by the policyholder and [defendant]." *See* 1993 Policy at 21 (A. 1560).[1]

In or about November 1996, defendant sent Acme a document entitled "Endorsements and Amendments," which stated that, effective November 1, 1996, the Policy would be modified by adding the following paragraph to the "Claims Provision" section:

> **Authority**
> We have sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the Policy. All determinations and interpretations made by us are conclusive and binding on all parties.

(A. 1573). Unlike other "Endorsements and Amendments" contained in the Administrative Record, however, this document was not accompanied by a cover page which Acme could execute to indicate its approval. *Compare* A. 1567-72 with A. 1573. Plaintiff represents that this document was instead accompanied by a cover letter which stated that defendant had unilaterally "determined to amend" the Policy "[i]n light of a recent United States Supreme

---

[1]Numbers preceded by "A" refer to pages in the Administrative Record, attached as Exhibit A to the Affidavit of Michele Falen.

Court decision." *See* Sample Form Letter to ABC Company from Terry J. Kryshak, defendant's Chief Administrative Officer, dated Oct. 15, 1996 (attached as Ex. A to Def. Stat.). That cover letter did not request that Acme sign anything, but stated:

> The new provision expressly incorporates into your policy rights which First Fortis believes were already implicit in the policy from its inception.

*Id.* There is nothing in the Administrative Record to suggest that Acme took any action in response to this proposed amendment.

In April 1997, plaintiff's daughter died of asthma. Shortly thereafter, plaintiff developed psychological problems. According to Dr. Paula L. Grossman – a psychiatrist whom plaintiff first visited in October 1997 – plaintiff suffered from "Post Traumatic Stress Disorder with symptoms of panic attacks, flashbacks, nightmares, and insomnia" (A. 333). Dr. Grossman treated plaintiff with a combination of therapy and various medications and plaintiff, "although continuously suffering from internally painful symptoms was able to go to work" *Id.*

Sometime in 2000, plaintiff was diagnosed with polycythemia vera – a blood disorder in which the body produces too many red blood cells, causing the blood to thicken. There is no cure for polycythemia, but it can be treated – as it was in plaintiff's case – through phlebotomies. Plaintiff had a unit of blood withdrawn periodically to thin his red blood cells.

Following his diagnosis, plaintiff's emotional state declined to the point where he was no longer able to work. On January 19, 2001, plaintiff completed and filed a pre-printed claim form requesting disability benefits. Where that form requested information concerning the "Nature of illness and when symptoms first appeared," plaintiff wrote, "Panic disorders - Post Traumatic Stress Syndrome 4/97" (A. 336). Plaintiff's claim also attached a copy of an "Attending

Physician's Initial Statement of Disability" form on which Dr. Grossman listed plaintiff's

diagnoses as:

> Post Traumatic Stress Disorder (DSM IV - 309.81)
>
> Severe treatment resistant Panic Attack Disorder (DSM 300.01)
>
> Severe Major Depressive Disorder (agitated depression) - 296.23 - Treatment Resistant

(A. 335).  In describing plaintiff's subjective symptoms, Dr. Grossman wrote:

> Very frequent and severe panic attacks (1-2 attacks/day
> approximately 6 days/week), chronic anxiety and depression,
> intermittent agitation, lethargy and severe and chronic insomnia.
> Frequent flashbacks and nightmares about his daughter's
> death/dead body.

*Id.*  Under "Objective findings," Dr. Grossman wrote:

> Obsession/intrusive thoughts of his daughter's body as it appeared
> in the morgue when he had to identify it.  Severe panic attacks –
> occurring 1-2 times daily when at work with vomiting/fainting as
> sequelae.  Agitated depression.

*Id.*  On the form, Dr. Grossman made no mention of plaintiff's polycythemia, and wrote "N/A"

in the space labelled "Physical Impairment."  *Id.*

Plaintiff's claim for disability benefits was approved on March 21, 2001 (A. 230-31),

shortly before plaintiff moved to Arizona (A. 314).  In September 2001, plaintiff completed a

Supplementary Report in which he listed the "symptoms or problems" which prevented him

from returning to work as "polycythemia [–] acute panic attacks – aggravated depression – post

traumatic stress syndrom [sic]" (A. 197).  The "Attending Physician" portion of this

Supplemental Report was completed by Dr. Grossman, who listed plaintiff's diagnoses as

follows:

> Axis I:        (1) 309.81 (PTSD); (2) 300.01 (PAD); 296.23

Axis III:     Polycythemia
Axis IV:     Severe stress – sudden death of daughter

*Id.* Under the heading, "Subjective Symptoms," Dr. Grossman wrote, "Polycythemia Vera – needs very frequent phlebotomies," next to the word "Physical" (A. 198). However, while Dr. Grossman reported that plaintiff was fainting, on average, twice a day, she stated that these "syncopal episodes" were secondary to the 3 to 5 panic attacks plaintiff experienced daily. *Id.*

At the same time plaintiff completed his Supplementary Report, he completed an "Activities of Daily Living Claim Statement," in which he stated that he was unable to bathe without another person's assistance (A. 201). In explaining why he needed the assistance, plaintiff wrote, "because of panic attacks fainting may occur." *Id.* In the section reserved for comments, plaintiff wrote, "Panic attacks averaging 3 to 5 daily often include fainting + vomitting [sic]" (A. 202).

On December 12, 2002, defendant mailed plaintiff a letter, requesting a Supplementary Report and informing him that, pursuant to the terms of his insurance policy, his disability benefits would end on March 20, 2003 (A. 190). On December 16, 2002, plaintiff completed the Supplementary Report (A. 124). Plaintiff's portion of that Supplementary Report, unlike the September 2001 report, omitted any mention of polycythemia, stating that the "symptoms or problems" that prevented plaintiff from returning to work were "panic attacks, aggravated depression, [and] post traumatic stress syndrom [sic]" (A. 124). The Attending Physician portion of the form, completed by Dr. Grossman on December 18, 2002, listed polycythemia and "syncopal episodes, dizziness" among the Axis III diagnoses. *Id.* Under "Subjective Symptoms," Dr. Grossman wrote "very frequent episodes of emesis with vasovagal fainting;

insomnia, dizziness, syncopal episodes, vertigo" (A. 125). Under "Objective Findings," Dr. Grossman listed the following physical maladies: "Hyperlipidemia, polycythemia, vetebro-basilar syndrome with dizziness + fainting frequent falls with resultant injuries." *Id.*

On December 26, 2002, Dr. Grossman faxed defendant's Claim Specialist, Laura Boswell, a one-page letter dated December 23, 2002. In contrast to earlier submissions in which she described the fainting as secondary to plaintiff's panic attacks, Dr. Grossman now stated that plaintiff's fainting episodes had two distinct causes. First, Dr. Grossman stated that the fainting episodes associated with plaintiff's panic attacks were "a result of valsalver and subsequent vaso-vagal stimulation which is a disability caused by a physical problem" (A. 180). Dr. Grossman then suggested that plaintiff's fainting was attributable to his polycythemia:

> In addition to this condition [*i.e.*, the fainting episodes associated with the panic attacks], he has had separate physical symptoms of intermittent episodes of dizziness and faint feeling that are not part of a panic attack. These symptoms were also disabling and interfered with his functioning. * * * In discussing these symptoms with a colleague who is an internist he suggested that they were consistent with circulatory problems in the veterbro-basilar system (*i.e.*, circulatory problems in part of the brain) and the increased viscosity of his blood caused by his severe polycythemia could potentially create or exacerbate this problem. The suggestion was therefore made to the patient to try a daily aspirin for the blood thinning effect. The frequency of these dizzy episodes diminished with this treatment although episodes did still occur, including 2 episodes of fainting.

*Id.* (bracketed material added). Noting that she had "advised extreme caution with driving" and had instructed plaintiff "not to drive at all if he experiences any of the above symptoms or if he feels them coming on," Dr. Grossman concluded that these "conditions create a medical situation in which he is incapacitated and unable to work." *Id.* In addition, she noted:

> Mr. Katzenberg also reports that he experiences light headness [sic] and dizziness on the days that he has his phlebotomies for the polycythemia and for the entire next day after this procedure. He

> receives phlebotomies every 2 weeks. *   *   * The episodes of
> dizziness and fainting are so frequent that they would interfere
> with his ability to consistently work or be gainfully employed.

*Id.*

In January 2003, plaintiff filed another Supplementary Report, which was received by

defendant on January 22, 2003. Attached to that report was an Attending Physician Statement

executed on January 7, 2003, by Dr. Lanny I. Hecker, plaintiff's hematologist in Arizona (A.

199). Dr. Hecker listed plaintiff's diagnoses as "(1) Polycythemia, (2) post traumatic stress

disorder, (3) panic attacks." *Id.* Although defendant's Rule 56.1 Statement represents that Dr.

Hecker's form also lists "(4) fainting spells," Def. Stat. ¶ 17, Dr. Hecker appears to have written

a period after "(3) Panic attacks," and to have written, "Fainting spell vertebrobasilar

insufficiency," thereafter. *Id.* However, in the section asking Dr. Hecker to explain how

plaintiff's symptoms affected his ability to work, Dr. Hecker addressed only the fainting spells,

stating:

> He has persistent fainting spells and cannot drive or operate
> machinery. * * * Check with Dr. Grossman for psychiatric details.

*Id.* Dr. Hecker also wrote, "N/A," in the section entitled, "Physical Impairment." *Id.*

At some point in January 2003, defendant received a letter from Dr. Hecker, dated

December 20, 2002, in which the doctor suggested that plaintiff's fainting spells might be related

to his polycythemia (A. 177-78). After noting that he had treated plaintiff for several years for

"polycythemia rubra vera" and that plaintiff required "phlebotomies very frequently," Dr.

Hecker stated:

> Two things about his polycythemia may contribute to his fainting
> spells – One is the high concentration of blood in his cerebral
> capillaries, creating sludging and perhaps neurological changes.

> The other, of course, is the syncope that he may experience from
> the blood loss required with his frequent phlebotomies. Either or
> both can contribute to his current symptomology. Thus, the sum of
> all his problems, especially the polycythemia and his treatments,
> has resulted in these severe problems.

(A. 177).

In February 2003, defendant sent plaintiff medical records and the correspondence from Drs. Grossman and Hecker to Dr. Allen J. Parmet for a Clinical Service Review. Dr. Parmet, a Kansas City physician whose letterhead indicates that he is "Board Certified in Occupational Medicine and Aerospace Medicine" (A. 16), concluded plaintiff was not disabled as a result of his physical maladies. Dr. Parmet noted that plaintiff had received phlebotomies two or three times a month, and listed the hematocrit levels determined in 38 blood tests plaintiff underwent between July 10, 2001, and December 30, 2002 (A. 18-19). Dr. Parmet then stated:

> The claimant's blood counts have remained in an acceptable level
> and there should not be episodes of vascular sludging as one
> provider speculated upon, particularly not 10 to 12 times per day
> without causing serious and permanent neurologic damage. The
> speculation by Dr. Hecker that the claimants [sic] multiple
> episodes of fainting are on a basis of polycythemia and
> hyperviscosity state are unsustainable on a scientific basis. This
> would be very easy to objectively demonstrate.

(A. 20). After noting that "anxiety attacks with hyperventilation and vasovagal syncope are extremely common," *id.*, Dr. Parmet concluded:

> The physical diagnoses present do not substantiate functional
> limitations in performing the material duties of his occupation.
> Polycythemia vera does not impose physical limitations unless
> hyperviscosity is untreated resulting in coagulation in both the
> arterial and venous systems and infarctions of multiple organs.
> There is no objective evidence that this has take [sic] place. Mr.
> Katzenberg's physical condition has been adequately treated and
> there are no physical restrictions on this basis.

*Id.*

By letter dated February 27, 2003, defendant informed plaintiff that his long-term

disability claim was denied (A. 2-4). That letter noted that the Policy provided that a person was disabled when a sickness prevented him or her "from performing the material duties of your regular occupation," and that defendant had concluded that plaintiff's physical condition did not prevent him from performing the material duties of a president (A. 2). The letter specifically stated that defendant had not given consideration "to the specific duties of a particular job with a particular employer," but rather had evaluated plaintiff's "ability to perform the occupational duties as they are typically performed in the labor market." *Id.* Defendant did "not consider activities such as driving to be material duties of the occupation of President" (A. 3), which defendant believed was "sedentary in nature" (A. 2).

Plaintiff pursued an administrative appeal. On March 21, 2003, plaintiff completed an Appeals Request Form, in which he stated his intention to appeal and stated that he was putting together an "appeal package," including doctors' diagnoses (A. 579). Defendant subsequently received a two-page letter from Dr. Hecker, dated April 1, 2003 (A. 580). That letter explained that plaintiff had asked Dr. Hecker "to write another letter for him because of the difficulty he is having and his inability to work," and noted that patients with polycythemia could experience "dizziness, visual disturbance and paresthesias." *Id.* Dr. Hecker also noted that the production of red blood cells, "particularly at an increased rate, is a very fatiguing process," making "weakness" one of the "symptoms of polycythemia that remains throughout, whether the patient is treated or not." *Id.* Dr. Hecker concluded his letter by stating:

> Although I am not a psychiatrist and cannot comment on psychological problems that Mr. Katzenberg may be having, I do know that he does have physical symptoms that make it almost impossible for him to conduct himself in normal working situations and make it impossible for him to function as a president of any corporation. His frequent falls have been injurious and increasing in frequency. The added weakness from the hypermetabolic demands of polycythemia make his condition worse.

9

> Just observing Mr. Katzenberg in our office when he comes for his
> treatments, it is impossible for me to imagine how he could
> possibly function in any setting of responsibility or one that
> requires a physical presence.
>
> I think it would be wise to consider Mr. Katzenberg's request since
> I do not see how he would be able to function under his current
> physical condition.

(A. 580-81).

In response to defendant's April 16, 2003, requests for further information, plaintiff sent over 150 pages of material (A. 424-578), which defendant received on May 21, 2003. The material was prefaced by a three-page letter from plaintiff, in which he explained that he was experiencing two different types of fainting episodes:

> As explained to me, when I periodically faint from a panic attack it
> is because I choke on phlegm or bile coming up and the vaso-
> vagas nerve in the chest contracts causing a lack of air and
> subsequent fainting. The minute I faint this muscle relaxes and I
> come back to consciousness in a matter of seconds. *  *  * The
> other form of fainting I have begins as a dizzy spell, especially if I
> am bending over to pick something up. Sometimes the attack is
> only dizziness, sometimes the attack includes vomiting of food and
> sometimes the attack results in fainting. These attacks have
> resulted in my falling and injuring myself several times. When
> fainting occurs, I can be unconscious for as many as twelve
> minutes and have been. In addition to these dizzy and fainting
> spells, I have awakened with amnesia at least four times. During
> these spells, I could not remember my own name nor that of my
> wife. These attacks are extremely unnerving and seem to occur
> just prior to my scheduled phlebotomy. With panic attack fainting,
> I get a warning that one is coming on and I am able to get to a safe
> place where my medicine is kept. I sit on the floor to avoid injury.
> With the other kind of fainting, there is no warning and I am more
> apt to injure myself in the fall.

(A. 422). Plaintiff claimed that, as a result of these fainting episodes, he had not driven a car since July 2002 (A. 423).

In addition, plaintiff's letter described his physical condition in the days preceding and

following his phlebotomies, which generally occurred every other Wednesday.  According to

plaintiff, he would typically feel weak and lethargic on the Mondays before his phlebotomies

and be unable to "focus clearly on any subject" (A. 422).  This condition would worsen on

Tuesdays, causing him to have trouble finishing sentences and to be "more apt to have dizziness

and fainting."  *Id.*  On Wednesdays, plaintiff would generally feel "terribly ill" until the

phlebotomy, then weak thereafter from the loss of blood.  By Fridays, he would generally "feel

somewhat better."  *Id.*

The 150 pages of material accompanying plaintiff's letter, which consisted largely of tax

returns, lab results, other test results and medical records, included several letters or reports from

plaintiff's treating physicians.  First, there was a letter written by a neurologist, Dr. Jeffrey

Steier, to Dr. Hecker, in which Dr. Steier reported the findings of his April 11, 2003,

examination of plaintiff.  In that letter, Dr. Steier indicated that plaintiff was reporting "spells of

sudden loss of consciousness before each phlebotomy as well as episodes subsequent to this, . . .

usually . . . last[ing] for not more than several seconds" (A. 468).  Following his examination,

Dr. Steier gave the following diagnosis:

> Vagal episodes related to both multiple panic attacks and severe
> post traumatic stress syndrome.
>
> In addition, he does have independent spells related to decrease in
> circulation related to his primary polycythemia.

(A. 469).

Plaintiff's submission contained the last two pages of a seven-page report by Dr. Jay S.

Friedman, an Arizona internist, dated December 20, 2002.  This report indicated that plaintiff

had a "History of emesis-induced syncope as well as episodes of near-syncope," but that a brain

MRI in February 2002 had revealed no abnormalities other than "minimal sinus inflammatory

changes" (A. 472). A copy of a radiology report reflecting those MRI findings was also included (A. 489).

Plaintiff's submission also included a new letter from Dr. Grossman, dated April 8, 2003 (A. 528-29). As in her December 23, 2002, letter, a copy of which was also included with plaintiff's submission (A. 530), Dr. Grossman attributed plaintiff's frequent "syncopal episodes and episodes of dizziness and fainting" to two separate causes (A. 528). First, some were "due to vaso-vagal stimulation and valsaver effect," which Dr. Grossman characterized as "a physical condition that impairs his ability to function." *Id.* However, Dr. Grossman also reported that plaintiff had "separate episodes of dizziness, extreme tiredness, feelings of fogginess, slowed mentation, memory problems, and word retrieval difficulties" for about three days prior to his phlebotomies and "tiredness and lightheadedness" on the day after the procedure. *Id.* Dr. Grossman opined:

> During these episodes he has difficulty completing a sentence and loses his train of thought mid-sentence, which is a change from his normal state of functioning. He would be unable to make appropriate business decisions or finish tasks during these time periods. This makes him completely impaired to do any productive work for 4 out of every 10 days. These episodes are not due to any psychiatric cause and are due to physical etiology, most likely consistent with circulatory problems in the vertebro-basilar system of the brain being exacerbated by the thickness of the blood due to the very virulent form of Polycythemia that the patient is suffering from (requiring 2 phlebotomies per month).

*Id.*

Defendant sent plaintiff's records to Dr. Walter Longo, M.D. – a Board-certified internist and oncologist who was Board-eligible in hematology – for review. Def. Stat. ¶ 30; Pl. Stat. ¶ 30. Shortly thereafter, defendant sent Dr. Longo a copy of a letter from Dr. Friedman to Dr. Grossman, dated June 5, 2003, which had arrived after the rest of the documents had already

been sent to Dr. Longo (A. 413-14). This letter stated that plaintiff's "recurring episodes of transient memory embarrassment as well as syncope," could be "related to noncardiogenic syncope" and that plaintiff "may have intermittent microvascular sludging from his polycythemia" (A. 414).

In a report dated June 23, 2003 (405-09), Dr. Longo confirmed that plaintiff had polycythemia, but opined that "[t]he polycythemia in and of itself if appropriately managed should not lead to any type of major impairment; and if polycythemia alone were the only medical diagnosis, careful management of the hematocrit and maintenance of levels in acceptable range would alleviate most symptoms" (A. 406). In response to a question propounded by defendant, as to whether plaintiff's fainting spells and vomiting could be related to polycythemia, Dr. Longo stated:

> If hematocrit and hemoglobin are in suitable ranges, patients are generally asymptomatic from their polycythemia and do not have fainting spells. The vomiting and the vasovagal effects of the chronic panic disorders are not in any way related to the polycythemia.

(A. 407). Dr. Longo opined that recent lab reports indicated that plaintiff's "hematocrit and hemoglobin have been well controlled by phlebotomy," and that polycythemia, if controlled, "would not limit Mr. Katzenberg from performing his regular occupation as the president of a company" (A. 408). Dr. Longo noted that plaintiff had described "two types of fainting spells," but noted that it was "not common for patients with polycythemia to have fainting spells if the red cell numbers are under control" and that he was "unable to attribute the two different types of fainting spells as being in any way separate from his underlying psychiatric conditions." *Id.*

Dr. Longo's report specifically noted that he had been unsuccessful in efforts to contact Drs. Hecker and Steier (A. 407). However, Dr. Longo succeeded in speaking with Dr. Hecker

on August 12, 2003, and memorialized that conference in a letter dated August 14, 2003.

According to that letter, Dr. Hecker reported that plaintiff's polycythemia was "well controlled,"

and that plaintiff, who had a blood count every three of four weeks, had not even needed

phlebotomy following his most recent blood count (A. 365).  Dr. Longo then stated:

> Dr. Hecker reports that Mr. Katzenberg is clearly disabled, but the
> review of the record documents that disability is due to his
> psychiatric disorder.  Dr. Hecker reports that although there is
> subjective fatigue, the blood counts have been manageable and are
> in a range that would allow Mr. Katzenberg to function normally
> in a full time workday except for his underlying severe psychiatric
> disorders.

*Id.*

According to defendant, plaintiff was informed of Dr. Longo's supplementary letter, and

the comments Dr. Hecker purportedly made, on August 18, 2003.  Def. Stat. ¶ 34 (citing A. 363).

Plaintiff subsequently told defendant that he wished to submit additional information from Dr.

Hecker, and was given a few weeks in which to do so.  *Id.* (citing A. 343).  Plaintiff did not

provide that information; on September 2, 2003, plaintiff allegedly telephoned defendant to say

he had been unable to "get in to see Dr. Hecker" (A. 341).  However, plaintiff also represented

that his condition had improved in August 2003, and opined, based on his reading of Dr. Longo's

August 14 letter, that the doctors' comments related solely to plaintiff's condition in August, not

his pre-August condition.  *Id.*

In response to plaintiff's request, defendant referred the case back to Dr. Longo, along

with new medical records which indicated, *inter alia*, that plaintiff had only two phlebotomies in

the three-month period between June 4 and August 29, 2003 (A. 831, 833).  On September 18,

2003, Dr. Longo sent defendant yet another letter, indicating that he had been asked to clarify

whether his original report had related only to plaintiff's condition as of August 2003, or the period between January 20, 2001, and August 2003 (A. 824). Dr. Longo confirmed that his opinion related to the entire 2½-year period, opining that since the records indicated that plaintiff's polycythemia was well-controlled throughout, plaintiff's polycythemia would not have prevented him from performing his occupation during this period. *Id.* On September 30, 2003, defendant denied plaintiff's appeal, but informed him that he could appeal further to the Disability Appeals Committee (A. 806-10).

On October 14, 2003, plaintiff sent defendant a letter in which he stated that he was not claiming disability for the period following mid-August 2003, because he had not required phlebotomies since then (A. 798). However, he stated that he was "reiterating [his] claim" for the period between March to mid-August 2003. *Id.* Plaintiff referred to unspecified "letters" which allegedly stated that his polycythemia and cholesterol problems "have resulted in sludging and could very well be the cause of dizziness and fainting." *Id.* He further asserted that his non-panic-attack-related fainting problem had "subsided since mid-August 2003," and argued that this was evidence that these fainting episodes were caused by his polycythemia. *Id.* In addition, plaintiff summarized two "conditions not related to psychiatric conditions" as follows:

> 1. Dizziness and fainting usually coinciding with the day before and the day of a phlebotomy.
>
> 2. Continuous weakness the day prior, the day of and the day after a phylebotomy [sic].

*Id.* He also made three additional arguments:

> 3. Fainting episodes are distinctively different and should not be labeled as a psychiatric illness. With all due respect to Drs. Parmet and Longo, I am the one who suffered these episodes. I think it is important to note that these spells and this form of fainting stopped

15

when I no longer needed phlebotomies.  My psychological illnesses remain, but I have not had one episode of dizziness nor the type of fainting that was occurring while phlebotomies were necessary.

4.  Driving is an imperative need to fill the functions of a CEO.  Meetings with clientele and vendors are an integral part of being an executive.  To attend these meetings one must drive.  Obviously a person experiencing dizziness and fainting cannot drive.

5.  A person in a state of dizziness or extreme fatigue for the day before to the day after a phlebotomy cannot hold an executive position by being unable to work three out of every ten working days.  An executive must establish a feeling of continuity and assure his subordinates a feeling of control.  This cannot be done by what essentially is a part-time CEO.

(A. 799).

Although plaintiff did not submit any new medical records with his letter, defendant construed plaintiff's October 14 letter as an appeal to the Disability Appeals Committee.  That Committee affirmed the denial of benefits.  In an October 28, 2003, letter explaining the basis for that affirmance, defendant advised plaintiff that the Appeals Committee had concluded that "your fainting and reported weakness and fatigue are due to your psychiatric condition and that your polycythemia has not limited you from performing your regular occupation" and that "driving is not a material duty of your regular occupation" (A. 785).  According to the letter, the Appeals Committee also noted that plaintiff's driving had ceased prior to the onset of his disability, asserting, "your wife had been driving you to work." *Id.*  The letter also informed plaintiff that the Appeals Committee was "the final administrative remedy of appeal available," and that defendant was closing his file (A. 786).

Despite the foregoing, plaintiff continued to correspond with defendant.  In January 2004, plaintiff sent defendant records of his November 2003 hospitalization following several

strokes and grand mal seizures, suggesting that these records established that his disability was physical and stating, "this should put to rest any doubts that I am entitled to disability benefits" (A. 734).[2]  The Appeals Committee reviewed plaintiff's submissions, but concluded, "the stroke [was] unrelated to his condition in March of 2003" (A. 731).

In communicating the Appeals Committee's decision, Michele Falen, a Disability Appeals Specialist, explained that plaintiff's disability coverage had ended March 2003 – eight months prior to plaintiff's stroke (A. 729-30).  Ms. Falen set forth those provisions in the Policy which provided that a covered person's insurance ended on the date he or she stopped "active work."  Although the Policy provided that a policyholder could continue that person's insurance, the policy also provided that coverage could not be continued beyond the "Maximum Benefit Period for injury, sickness, or pregnancy covered under the policy." (A. 730) (emphasis omitted).  Since defendant had determined that plaintiff was not disabled as a result of any physical impairment, Ms. Falen reasoned, the Maximum Benefit Period expired on March 19, 2003, and plaintiff was not covered for "[a]ny medical conditions that give rise to an impairment and disability occurring after that date."  *Id.*

Believing that defendant had misinterpreted the thrust of his January 2004 submission, plaintiff sent defendant yet another letter on April 28, 2004.  Plaintiff asserted that his November 2003 strokes and grand mal seizures were evidence to support his claim that some of his episodes of dizziness and fainting were caused by physical problems.  He stated:

> It would appear that I had developed blood clots due to a
> prolonged period of polycythemia.  Eventually these same blood

---

[2]Although the parties agree that plaintiff was admitted and discharged on the same day, Def. Stat. ¶¶ 42-43, Pl. Stat. ¶¶ 42-43, hospital records contained in the Administrative Record indicate that plaintiff was hospitalized for five days – from November 19 to 23, 2003.  *See* A. 740.

> clots dislodged in November 2003 causing multiple strokes to the
> right side of my brain and multiple gran mal [sic] seizures.

(A. 726). Plaintiff asked defendant to contact Dr. Daniela Caltaru – a neurologist who had

treated him since March 2002 – and Drs. Grossman and Hecker, asserting that "[t]heir

information" would support his claim. *Id.*

The Appeal Committee reviewed this letter, but determined that there was no basis for

reconsideration because "no new information was submitted" (A. 696). In response, plaintiff

submitted letters from Drs. Caltaru, Hecker and Grossman. Dr. Caltaru's letter, dated July 7,

2004, states that, following a "complete stroke work-up" to identify the cause of plaintiff's

November 2003 stroke, Dr. Caltaru concluded that plaintiff's stroke may have been related to his

polycythemia (A. 638). The letter also states:

> Even his prior spells of dizziness and syncope could have been as
> well induced by high viscosity due to polycythemia.

*Id.* Dr. Hecker's letter stated:

> Mr. Katzenberg informed me that recently his neurologist has
> come to the conclusion that his mental status changes and passing
> out are due to a cerebrovascular accident.

(A. 691). Dr. Hecker then suggested that such a "cerebrovascular accident" could be related to

polycythemia, stating that "having polycythemia puts him at very high risk for a cerebrovascular

accident" and that, therefore, "there is a substantial medical reason for Mr. Katzenberg being

prone to cerebrovascular accidents." *Id.*

Dr. Grossman's letter largely repeated what she had stated in her previous letter, but was

shorter and more definitive. Dr. Grossman stated:

> The fainting spells and dizziness that he was experiencing in 2002
> and 2003 were separate symptoms from the panic attacks and

> depression and psychiatric problems. In my professional opinion,
> these symptoms were due to circulatory problems in the brainstem
> caused by the increased viscosity of his blood resulting from the
> polycythemia which eventually led to the stroke that he suffered.
> The types of episodes that he was having were consistent with
> vertebral-basalar syndrome (decreased posterior circulation) and
> were of physical causation, not psychiatric.

(A. 693).

In response to these letters, defendant requested a copy of Dr. Caltaru's records and sent them to Polly Galbraith, M.D., for an in-house review. Dr. Galbraith concluded that no new information was submitted, in that Dr. Caltaru's records indicated that the seizures and stroke had not occurred until eight months after the denial of benefits. Def. Stat. ¶ 49; Pl. Stat. ¶ 49; A. 651. Dr. Caltaru's medical records were then independently reviewed by the Appeals Committee, which concluded that this information did not alter their prior decision (A. 649). On September 28, 2004, Ms. Falen wrote plaintiff again, informing him of the Appeals Committee's decision and stating:

> [T]he evidence submitted does not support disability due to a
> physical condition as of March 19, 2003. Your seizures and
> subsequent stoke [sic] did not occur until 8 months after the denial
> of your benefits. The medical records from Dr. Caltaru's office
> indicate that she did not treat you between March 22, 2002 and
> December 3, 2003. It is important to note that we are looking for
> evidence of a disability, as a result of a physical condition, that
> existed as of March 19, 2003. Since the evidence submitted does
> not alter our conclusion, your claim file is now closed.

(A. 650).

Plaintiff sent defendant one final letter on October 14, 2004, accusing defendant of acting in "bad faith" and threatening to bring his case before the Consumer Service Bureau of the New York State Insurance Department unless defendant issued disability payments for the period

between March 19, 2003 and mid-August 2003 (A. 635-36). In that letter, plaintiff alleged that

his polycythemia "date[d] back to 1998" and represented that he could have "gone on disability

due to dizziness, fainting and the debilitating effects from this disease instead of psychological

ailments . . . ." (A. 635). Plaintiff also represented that both Dr. Caltaru and Dr. Hecker had

concluded that his polycythemia was the cause of his dizzy spells and fainting, and asserted that

defendant's decision to deny him benefits was "arbitrary" (A. 636).

On November 3, 2004, defendant sent plaintiff a letter stating that his October 14, 2004,

letter had been forwarded to the First Fortis Life Disability Committee for review (A. 618).

According to the letter, that Committee had determined that no new information was received

with the letter and referred plaintiff to its six prior letters denying him disability benefits.

*The Instant Action*

On March 2, 2005, plaintiff commenced the instant action for relief under Section 502 of

ERISA, 29 U.S.C. § 1132.[3] In his six-page complaint, plaintiff alleges that between March 2001

and March 2003, defendant paid him disability benefits "for a psychiatric condition which was

related to the death of his daughter." Complaint at ¶ 14. Plaintiff further alleges that, "[p]rior to

the expiration of his benefits for psychiatric condition [sic], [he] applied for benefits under the

Policy relating to various physical conditions which caused him to be disabled, including,

without limitation, a blood condition known as polycythemia which itself precipitated a stroke

---

[3]Documents contained in the Administrative Record suggest that plaintiff also filed a
complaint with the New York State Insurance Department. Some documents in the
Administrative Record suggest that the Insurance Department investigated plaintiff's complaint,
but neither party states what action, if any, the Insurance Department took with respect to this
case.

and seizures." *Id.* at ¶ 15. Asserting that defendant refused to honor the Policy when it "refused to pay [him] any benefits due under the policy for non-psychiatric conditions," *id.* at ¶ 16, plaintiff seeks a declaratory judgment, a mandatory injunction directing defendant to pay him all benefits due under the Policy "both retroactively and prospectively," and reasonable attorney's fees.

Defendant subsequently filed a "Motion for Judgment on the Administrative Record and/or Summary Judgment." That submission raises three issues. The first is how to characterize defendant's motion. The second issue (hereafter, the "Standard of Review Issue") is what standard of review should apply to this case: the "arbitrary and capricious" standard urged upon this Court by defendant or the *de novo* standard advocated by plaintiff. The third issue relates to the merits of the decision to deny plaintiff long-term disability benefits.

## DISCUSSION

As a preliminary matter, this Court must characterize the motion before it. A "Motion for Judgment on the Administrative Record" is not authorized in the Federal Rules of Civil Procedure. *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003). Many courts – including this Court in *Pava v. Hartford Life & Accident Ins. Co.*, No. 03 CV 2609 (SLT)(RML), 2005 WL 2039192 (E.D.N.Y. Aug. 24, 2005) – "have either explicitly or implicitly treated such motions, which are frequently made by insurers in ERISA benefits cases, as motions for summary judgment under Rule 56." *Muller*, 341 F.3d at 124.

Citing to *Pava*, plaintiff urges this Court to construe defendant's submission as a motion for summary judgment. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion ("Pl. Memo") at 21. Defendant, on the other hand, cites to *Muller* and other cases for the

proposition that "a motion for a judgment on the administrative record is 'essentially a bench trial on the papers' and is [an] appropriate way to review an ERISA claim administrator's decision." Defendant's Legal Memorandum in Support of Motion ("Def. Memo") at 15.

Defendant misconstrues the holding in *Muller*. In that case, the district court failed to address the issue of how to characterize a "motion for judgment on the administrative record." The Second Circuit noted that many courts had construed similar motions to be motions for summary judgment, *Muller*, 341 F.3d at 124, but because "the District Court had already denied summary judgment to First Unum on the very issue" raised in the motion before it, the Second Circuit was precluded from applying Rule 56. Forced to characterize the motion as something other than a motion for summary judgment, the *Muller* Court concluded that the lower court's decision could "best be understood as essentially a bench trial 'on the papers' with the District Court acting as the finder of fact." *Id.*

*Muller* cannot fairly be read as holding that one party can unilaterally initiate a bench trial prior to discovery and without the consent of the adversary or the Court. None of the cases cited by defendant endorse such a revolutionary proposition. In *Napoli v. First Unum Life Ins. Co.*, 78 Fed. Appx. 787, 2003 WL 22454481 (2d Cir. 2003) – a summary order improperly cited by defendant[4] – the district court construed a "Motion for Judgment on the Administrative Record" as a motion for summary judgment. *Id.*, 78 Fed. Appx. at 788, 2003 WL 22454481, at *2. The Second Circuit not only noted that it was bound by the district court's characterization of the motion, but subsequently reversed the lower court on the ground that the district had implicitly decided a genuine issue of material fact. *Id.*, 78 Fed. Appx. at 789, 2003 WL

---

[4]*See* Second Circuit Rules § 0.23.

22454481, at *2-*3.

In another case cited by defendant – *Henar v. First Unum Life Ins. Co.*, No. 02 Civ. 1570 (LBS), 2002 WL 31098495 (S.D.N.Y. Sept. 19, 2002) – both parties moved for judgment on the administrative record. Nonetheless, the *Henar* Court expressly applied the summary judgment standard is deciding these motions. *Id.*, 2002 WL 31098495, at *4. In *Casey v. First Unum Life Ins. Co.*, No. 5:00-CV-313 FJS GJD, 2004 WL 725953 (N.D.N.Y. Mar. 31, 2004), both parties effectively cross-moved for summary judgment, with one party referring to its motion as a motion for judgment on the administrative record. The court did not even address the issue of whether to apply the summary judgment standard.

Defendant is correct in noting that, if both parties agreed that the "arbitrary and capricious" standard of review applied to this case, the motion might be "properly considered as one akin to a motion under Rule 12(c) for judgment on the . . . pleadings and the transcript of the record before the Plan." *Rizk v. Long Term Disability Plan of the Dun & Bradstreet Corp.*, 862 F.Supp. 783, 791 (E.D.N.Y. 1994). However, the parties do *not* agree on the applicable standard of review. Accordingly, this Court construes defendant's submission as a motion for summary judgment.

*The Summary Judgment Standard*

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, the non-movant "must set forth specific facts

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)*; Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World*, 922 F.2d at 121 (internal quotations and citations omitted). Moreover, the disputed facts must be material to the issue in the case in that they "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

*The Applicable Standard of Review*

ERISA itself "does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). In *Firestone Tire & Rubber*, the Supreme Court filled this gap by holding that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. "Where the plan reserves discretionary authority for the administrator, however, 'denials are subject to the more deferential arbitrary and capricious standard, and may be overturned only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Gibbs v. CIGNA Corp.*, 440 F.3d 571, 575 (2d Cir. 2006) (quoting *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999)). "[T]he party arguing for the more deferential standard of review [] 'bears the burden of proving that the arbitrary and capricious standard of review applies.'" *Id.* "'Any ambiguities must be construed against the administrator and in favor of the party seeking judicial review.'" *Winter v. Hartford Life & Accident Ins. Co.,* 309 F. Supp. 2d 409, 413-14 (E.D.N.Y.2004) (quoting *Arthurs v. Metropolitan Life Ins. Co.,* 760 F.Supp. 1095, 1098 (S.D.N.Y.1991)).

In this case, defendant has not demonstrated that there is no genuine issue of fact as to whether the governing Plan documents grant discretionary authority to defendant. The parties agree that the 1993 Policy originally contained no provision giving defendant discretionary authority to determine eligibility for benefits or to construe the terms of the Policy. Defendant contends, however, that the 1993 Policy was amended in 1996, when defendant sent Acme a document entitled "Endorsements and Amendments." The document stated that, effective November 1, 1996, the policy would be modified by adding a paragraph giving defendant "sole discretionary authority to determine the eligibility for participation or benefits and to interpret the terms of the Policy." (A. 1573).

The 1993 Policy, however, expressly provided that it could only "be changed . . . by an endorsement or amendment *agreed upon by the policyholder* and [defendant]" (A. 1560) (emphasis added). Defendant has produced no evidence that defendant obtained, or even sought, Acme's approval of this modification. To the contrary, defendant's reply papers implicitly concede that the document was *not* signed, arguing instead that other "Endorsements and Amendments" contained in the administrative record were also not signed and alleging that the parties had adopted a "common practice" of interpreting "silence as assent to the amendments and endorsements." *See* Defendant's Legal Memorandum in Reply to Plaintiff's Opposition ("Def. Reply") at 5.

In his opposition papers, plaintiff persuasively argues that silence "is not the type of consent that the language of the policy requires." Pl. Memo at 24-25. In addition, plaintiff asserts that the "Endorsements and Amendments" which purportedly granted defendant discretionary authority differed from previous "Endorsements and Amendments" in that it was

not accompanied by a cover letter requesting Acme's approval.  Instead, according to plaintiff, the cover letter accompanying the "Endorsements and Amendments" at issue announced that defendant had unilaterally decided to amend the Policy "in light of a recent United States Supreme Court decision." (*See* Sample Form Letter to ABC Company from Terry J. Kryshak, defendant's Chief Administrative Officer, dated Oct. 15, 1996 (attached as Ex. A to Def. Stat.)). That cover letter did not request that Acme sign anything, but stated:

> The new provision expressly incorporates into your policy rights which First Fortis believes were already implicit in the policy from its inception.

*Id.*

Plaintiff's assertions that defendant never sought Acme's approval for the amendment granting defendant discretionary authority gains some support from the fact that two other proposed "Endorsements and Agreements" contained in the Administrative Record have spaces for signatures.  *See* A. 1567-72.  The "Endorsements and Agreements" form at issue does not. A. 1573.  Accordingly, this Court finds that there is a genuine issue of material fact with respect to whether the Policy was amended in 1996 to grant defendant discretionary authority.

To be sure, defendant has established that the language contained in the "Endorsements and Agreements" document at issue was added to the 2002 Policy, which became effective on October 1, 2002. Plaintiff does not question that the 2002 Policy contained this language, but argues that the 1993 Policy governs because (1) plaintiff was already collecting disability benefits and was disabled due to polycythemia prior to October 1, 2002, and (2) plaintiff's Supplemental Report dated August 25, 2001, advised defendant that polycythemia was among the "symptoms or problems" which prevented plaintiff from returning to work. *See* Pl. Memo at 25. This Court agrees with plaintiff that the 2002 Policy does not apply to this case.

In *Gibbs v. CIGNA Corp.*, *supra*, the Second Circuit faced a situation similar to that at bar. In that case, the parties disagreed on whether the plan provided discretionary authority to the plan administrator. The plaintiff relied on a version of the summary plan description which was current at the time Gibbs became disabled; the defendants relied on an amended version, which was in effect at the time of the disability determination and which provided for discretionary authority.

The Second Circuit held that the amendment did not apply to Gibbs' claim "because his right to disability benefits vested prior to CIGNA's amendment of the Plan." *Gibbs*, 440 F.3d at 576. Although the Court noted that the determination of "[w]hether an employee's benefits have vested under an ERISA welfare plan is a matter of contract interpretation," it reaffirmed its prior holding that "as a matter of law . . . , absent explicit language to the contrary, a plan document providing for disability benefits promises that these benefits vest with respect to an employee no later than the time that the employee becomes disabled." *Id.* (quoting *Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1212 (2d Cir. 2002)). The Court reasoned:

> Once the employee's rights have vested, an employer's
> "subsequent unilateral adoption of an amendment which is then
> used to defeat or diminish the [employee's] fully vested rights . . .
> is . . . ineffective."

*Id.* (bracketed material and elipses in original).

In this case, plaintiff became disabled and began collecting benefits under the Policy in March 2001. Defendant has not directed this Court's attention to any explicit language in the Policy which suggests that plaintiff's disability benefits were not vested as of that date. The 2002 Policy, which became effective about one and one-half years after plaintiff's benefits vested, was ineffective to diminish plaintiff's rights. Accordingly, although the 2002 Policy may have explicitly granted discretionary authority to defendant, this Policy does not apply to plaintiff's claims in this case.

*The Merits of Plaintiff's Claim*

This Court not only concludes that defendant is not entitled to summary judgment with respect to the Standard of Review Issue, but also concludes that defendant is not entitled to summary judgment with respect to the merits of plaintiffs' claim. "Where an ERISA plan does not accord an administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a district court reviews all aspects of an administrator's eligibility determination, including fact issues, *de novo*." *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441-42 (2d Cir. 2006) (internal quotations and citations omitted). "Under this standard, no deference at all is accorded to defendant's interpretation of the Plan but on the contrary, any ambiguities in the Plan are to be construed in plaintiff's favor." *Slupinski v. First Unum Life Ins. Co.*, No. 99 Civ. 0616 (TPG), 2005 WL 2385852, at *5 (S.D.N.Y. Sept. 27, 2005).

In a dispute over long-term disability benefits, a plaintiff "has the burden of proving by

clear and convincing evidence that he is totally disabled within the meaning of the plan." *Paese*

*v. Hartford Life & Accident Ins. Co.*, No. 02 Civ. 9778 (DC), 2004 WL 764760, at *9 (S.D.N.Y

Apr. 9, 2004), *aff'd in relevant part*, 449 F.3d at 441 (expressly stating that the district court's

statement of the burden upon plaintiff was correct).  In this case, plaintiff has the burden of

proving that he was totally disabled as a result of his polycythemia.  Defendant has introduced

testimony from two physicians who opine that the evidence in the Administrative Record does

not suffice to meet that burden.  However, plaintiff asserts that there is sufficient evidence in the

Administrative Record to create a genuine issue of material fact with respect to whether

plaintiff's polycythemia rendered him disabled.

In arguing for summary judgment, defendants rely on the opinions of Drs. Parmet and

Longo, both of whom reviewed plaintiff's file at defendant's request.  Dr. Parmet opined:

> Polycythemia vera does not impose physical limitations unless
> hyperviscosity is untreated resulting in coagulation in both the
> arterial and venous systems and infarctions of multiple organs.
> There is no objective evidence that this has taken place.  Mr.
> Katzenberg's physical condition has been adequately treated and
> there are no physical restrictions on this basis.

(A. 20).  Dr. Longo concurred with Dr. Parmet's view that "polycythemia in and of itself if

appropriately managed should not lead to any type of major impairment; and if polycythemia

alone were the only medical diagnosis, careful management of the hematocrit and maintenance

of levels in acceptable range would alleviate most symptoms" (A. 406).  Dr. Longo further

stated:

> If hematocrit and hemoglobin are in suitable ranges, patients are
> *generally* asymptomatic from their polycythemia and do not have
> fainting spells.  The vomiting and vasovagal effects of the chronic
> panic disorders are not in any way related to the polycythemia.

(A. 407) (emphasis added).  Dr. Longo opined that it was "*not common* for patients with

polycythemia to have fainting spells if the red cell numbers are under control" (A. 408) (emphasis added), and that polycythemia, if controlled, "would not limit [plaintiff] from performing his regular occupation as the president of a company" (A. 408). After contacting plaintiff's hematologist, Dr. Hecker, who allegedly represented that plaintiff's polycythemia was well controlled, Dr. Longo was "unable to attribute the two different types of fainting spells as being in any way separate from his underlying psychiatric condition." *Id.*

Neither Dr. Parmet nor Dr. Longo, however, provided conclusive evidence that plaintiff's fainting episodes were unrelated to his polycythemia. Dr. Parmet reviewed the results of 38 of plaintiff's blood tests, determined that the hematocrit levels determined by those tests were at "an acceptable level" and opined that "there should not be episodes of vascular sludging . . . , particularly not 10 to 12 times a day without causing serious and permanent neurologic damage" (A. 20). However, Dr. Parmet, who never examined or treated plaintiff, appears to have misunderstood the frequency of plaintiff's alleged fainting episodes. Moreover, he did not foreclose the possibility that "episodes of vascular sludging" could occur despite "acceptable" hematocrit levels.

Dr. Longo also never examined plaintiff and had no personal knowledge concerning his treatment. Rather, his belief that plaintiff's polycythemia was well-controlled was based on statements purportedly made by the very doctor responsible for keeping plaintiff's polycythemia under control. Like Dr. Parmet, Dr. Longo did not rule out the possibility that patients with well-controlled polycythemia might have fainting spells, stating only that it was "not common" (A. 408).

Even if the opinions of Drs. Parmet and Longo were sufficient to sustain defendant's burden upon its motion for summary judgment, plaintiff created a genuine issue of fact by

providing several contrary medical opinions. In a letter dated December 20, 2002, plaintiff's hematologist, Dr. Hecker, suggested that plaintiff's fainting spells might be related to his polycythemia:

> Two things about his polycythemia may contribute to his fainting spells – One is the high concentration of blood in his cerebral capillaries, creating sludging and perhaps neurological changes. The other, of course, is the syncope that he may experience from the blood loss required with his frequent phlebotomies. Either or both can contribute to his current symptomology.

(A. 177-78). One of plaintiff's neurologists, Dr. Steier, reached a similar conclusion in April 2003, after plaintiff reported "spells of sudden loss of consciousness before each phlebotomy as well as episodes subsequent" to the phlebotomy (A. 468). Dr. Steier concluded that plaintiff not only had "[v]agal episodes related to both multiple panic attacks and severe post traumatic stress syndrome," but also had "independent spells related to decrease in circulation related to his primary polycythemia" (A. 469).

Yet another treating physician, Dr. Grossman, unequivocally stated that there was a causal relationship between plaintiff's polycythemia and his fainting episodes. In a letter dated July 16, 2004, Dr. Grossman stated:

> The fainting spells and dizziness that he was experiencing in 2002 and 2003 were separate symptoms from the panic attacks and depression and psychiatric problems. In my professional opinion, these symptoms were due to circulatory problems in the brainstem caused by the increased viscosity of his blood resulting from the polycythemia which eventually led to the stroke that he suffered. The types of episodes that he was having were consistent with vertebral-basalar syndrome (decreased posterior circulation) and were of physical causation, not psychiatric.

(A. 693).

Although Dr. Grossman is a psychiatrist, not a hematologist, her opinion was supported

to some degree by a July 4, 2004, letter from Dr. Caltaru, who had performed a "complete stroke work-up" to identify the cause of plaintiff's November 2003 stroke. Dr. Caltaru concluded that plaintiff's stroke may have been related to his polycythemia, and that plaintiff's "prior spells of dizziness and syncope could have been as well induced by high viscosity due to polycythemia." (A. 638). This opinion not only lent support to the view that plaintiff's fainting was caused by his polycythemia, but suggested that plaintiff's polycythemia had not been as well controlled as Dr. Hecker had claimed or as Drs. Parmet and Longo believed.

Even if there had been conclusive proof that plaintiff's fainting was unrelated to his polycythemia, there was evidence to suggest that polycythemia and the phlebotomies used to control it were so fatiguing and would have necessitated such frequent absences from work as to render plaintiff unable to function as a CEO. In a letter dated April 1, 2003, Dr. Hecker noted that the production of red blood cells, "particularly at an increased rate, is a very fatiguing process," making "weakness" a "symptom of polycythemia that remains throughout, whether the patient is treated or not" (A. 580). *Id.* Dr. Hecker further opined that plaintiff had "physical symptoms that make it almost impossible for him to conduct himself in normal working situations and make it impossible for him to function as a president of any corporation," concluding, "I do not see how [plaintiff] would be able to function under his current physical condition." *Id.*

Echoing Dr. Hecker, plaintiff affirmatively stated that the fatigue associated with the polycythemia and phlebotomies would have prevented him from functioning effectively as a CEO. In his letter to defendant dated October 14, 2003, plaintiff wrote:

> A person in a state of dizziness or extreme fatigue for the day
> before to the day after a phlebotomy cannot hold an executive

> position by being unable to work three out of every ten working
> days.  An executive must establish a feeling of continuity and
> assure his subordinates a feeling of control.  This cannot be done
> by what essentially is a part-time CEO.

(A. 799).

Plaintiff's claims of extreme fatigue are supported by Dr. Grossman's observations of plaintiff before and after his frequent phlebotomies.  Dr. Grossman stated that plaintiff had "episodes of dizziness, extreme tiredness, feelings of fogginess, slowed mentation, memory problems, and word retrieval difficulties" for about three days prior to his phlebotomies and "tiredness and lightheadedness" on the day after the procedure (A. 528).  Dr. Grossman opined that during these episodes:

> He would be unable to make appropriate business decisions or
> finish tasks . . . mak[ing] him completely impaired to do any
> productive work for 4 out of every 10 days.

*Id.*  Dr. Grossman further opined that these episodes were "not due to any psychiatric cause [but] . . . due to physical etiology." *Id.*

Thus, even if there were no genuine issue of material fact as to whether plaintiff's polycythemia caused his fainting spells, plaintiff's statement, Dr. Hecker's opinion and Dr. Grossman's observations might permit a finder of fact to conclude that plaintiff was disabled for reasons unrelated to his fainting.  Defendant's motion for summary judgment with respect to the merits of plaintiff's disability claim is, therefore, denied.

## CONCLUSION

For the reasons set forth above, defendant's motion is construed as one for summary judgment pursuant to Fed. R. Civ. P. 56. Defendant's motion for summary judgment with respect to the Standard of Review Issue and with respect to the merits of plaintiff's disability claim is denied.

**SO ORDERED**.


_____/s/_____
SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
         May 25, 2007